06-4800-cv (L)
Kiobel v. Royal Dutch Petroleum

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Submitted on: October 15, 2010    Decided: February 4, 2011)

Docket Nos. 06-4800-cv, 06-4876-cv

- - - - - - - - - - - - - - - - - - - - - - -x

ESTHER KIOBEL, individually and on behalf of her late husband, DR. BARINEM KIOBEL, BISHOP AUGUSTINE NUMENE JOHN-MILLER, CHARLES BARIDORN WIWA, ISRAEL PYAKENE NWIDOR, KENDRICKS DORLE NWIKPO, ANTHONY B. KOTE-WITAH, VICTOR B. WIFA, DUMLE J. KUNENU, BENSON MAGNUS IKARI, LEGBARA TONY IDIGIMA, PIUS NWINEE, KPOBARI TUSIMA, individually and on behalf of his late father, CLEMENTE TUSIMA,
     Plaintiffs-Appellants-Cross-Appellees,

          - v.-

ROYAL DUTCH PETROLEUM CO., SHELL TRANSPORT AND TRADING COMPANY PLC,
     Defendants-Appellees-Cross-Appellants,

SHELL PETROLEUM DEVELOPMENT COMPANY OF NIGERIA, LTD.,
     Defendant.
- - - - - - - - - - - - - - - - - - - - - - -x

     Before:      JACOBS, Chief Judge, LEVAL and CABRANES,
                  Circuit Judges.

     A petition for panel rehearing having been made by

Plaintiffs-Appellants-Cross-Appellees, the petition is

hereby **DENIED**.  Chief Judge Jacobs concurs by opinion; Judge Cabranes concurs by opinion; Judge Leval dissents by opinion.

Paul L. Hoffman, Schonbrun DeSimone Seplow Harris & Hoffman, LLP, Venice, CA (Carey R. D'Avino, Berger & Montague, P.C., Philadelphia, PA, on the brief), for Plaintiffs-Appellants-Cross-Appellees.

Rowan D. Wilson (Rory O. Millson, Thomas G. Rafferty, on the brief), Cravath, Swaine & Moore LLP, New York, NY, for Defendants-Appellees-Cross-Appellants.

**ORDER**

A petition for panel rehearing having been made by Plaintiffs-Appellants-Cross-Appellees, the petition is hereby **DENIED**.

Chief Judge Jacobs concurs in a separate opinion.

Judge Cabranes concurs in a separate opinion.

Judge Leval dissents in a separate opinion.

2

DENNIS JACOBS, <u>Chief</u> <u>Judge</u>, concurring in the denial of panel rehearing:

I concur in the denial of panel rehearing, for the following reasons. Having subscribed to Judge Cabranes's sound and elegant opinion, I see no reason to revisit its argument. At the same time, I acknowledge that Judge Leval's opinion is worked out with a certain scholarly force, and has an academic constituency. By this concurring opinion, however, I subject Judge Leval's conclusion to some tests of reality.

**A**

Judge Leval's opinion argues in favor of corporate liability under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for violations of the norms of customary international law. It is *not* argued that this remedy is consistent with international practice, or even known to any country or court beyond our borders. Instead, Judge Leval argues that "the law of nations . . . leav[es] it to each State to resolve questions of civil liability . . ." and that "international law leaves the manner of remedy to the independent determination of each State." <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 621 F.3d 111, 175, 176 (2d Cir. 2010) (Leval, J., concurring). Judge Leval's opinion thus rests

on the idea that no account need be taken of *how* customary international law is enforced in our courts.

That proposition can be tested. The pirate is the enemy of all mankind and offends international norms that are universal among civilized countries; so the United States should have no trouble achieving extradition of a pirate. But if the remedy in this country entails capital punishment, one would soon see that other nations have a lively interest in the processes and remedies afforded under United States law, an interest apart from the bare classification of piracy as violative of a norm of customary international law. See, e.g., Soering v. United Kingdom, 161 Eur. Ct. H.R. 8 (ser. A) (1989) (refusing to extradite a German national from the United Kingdom to the United States on murder charges, citing the European Convention on Human Rights, on the ground that the "death row phenomenon" is inhumane or degrading treatment); Agreement on Extradition Between the European Union and the United States of America art. 13, U.S.-Eur. Union, June 25, 2003, S. Treaty Doc. No. 109-14 ("Where the offence for which extradition is sought is punishable by death under the laws in the requesting State and not punishable by death under the laws in the

2

requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the requesting State, on condition that the death penalty if imposed shall not be carried out.").

**B**

"[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir. 2003). The marked characteristic of the whole system is a commonality of interest aligned against the enemies of all mankind. The idea of corporate liability does not withstand scrutiny in that light.

All the cases of the class affected by this case involve transnational corporations, many of them foreign. Such foreign companies are creatures of other states. They are subject to corporate governance and government regulation at home. They are often engines of their national economies, sustaining employees, pensioners and

3

creditors--and paying taxes. I cannot think that there is some consensus among nations that American courts and lawyers have the power to bring to court transnational corporations of other countries, to inquire into their operations in third countries, to regulate them--and to beggar them by rendering their assets into compensatory damages, punitive damages, and (American) legal fees. Such proceedings have the natural tendency to provoke international rivalry, divisive interests, competition, and grievance--the very opposite of the universal consensus that sustains customary international law.

The imposition of liability on corporations, moreover, raises vexed questions. What employee actions can be imputed to the corporation? What about piercing the corporate veil? Can these judgments be discharged in bankruptcy, and, if so, in the bankruptcy courts of what country? Punitive damages is a peculiar feature of American law; can they be exacted? These issues bear on the life and death of corporations, and are of supreme consequence to the nations in which the defendant corporations were created, make their headquarters, and pay their taxes. Is it clear that the nations of the earth would be complacent about

4

having these matters decided in U.S. courts?

The dominant view elsewhere is well expressed by former South African President Thabo Mbeki, who, prior to our decision in <u>Khulumani v. Barclay Nat'l Bank Ltd.</u>, 504 F.3d 254 (2d Cir. 2007), said: "We consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country . . . ." President Thabo Mbeki, Statement by President Thabo Mbeki to the National Houses of Parliament and the Nation, on the Occasion of the Tabling of the Report of the Truth and Reconciliation Commission (Apr. 15, 2003). Later, President Mbeki decried the <u>Khulumani</u> decision as a form of "judicial imperialism," President Thabo Mbeki, Response to National Assembly Question Paper (Nov. 8, 2007), because it "impl[ied] that U.S. courts are better placed to judge the pace and degree of South Africa's national reconciliation." <u>Khulumani</u>, 504 F.3d at 295 (Korman, J., dissenting) (internal quotation marks and citations omitted).

By definition, no one would protect any enemy of all mankind, so it is telling that each and every country *does* protect and foster the companies that fuel its national

5

economy and that project its economic power and interests under such regulation as each country deems sufficient. These policy considerations explain why no international consensus has arisen (or is likely to arise) supporting corporate liability. Is it plausible that customary international law supports proceedings that would harm other civilized nations and be opposed by them--or be tantamount to "judicial imperialism"?

C

In this Circuit, the underlying question of law is one of no big consequence. That is because of our opinion in Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244 (2d Cir. 2009), which holds that aiding and abetting liability does not lie under the ATS unless the conduct is done with the positive *intention* of bringing about a violation of the Law of Nations. Id. at 259. So, unless a company has purposefully engaged in the business of genocide, slavery, piracy, etc., there can be no corporate liability under that statute in this Circuit. The incremental number of cases actually foreclosed by the majority opinion in Kiobel approaches the vanishing point.

6

Judge Leval's opinion concurring in the judgment of the Court posits the idea that slavers and pirates will now rush into corporate transactions. <u>Kiobel</u>, 621 F.3d at 155-56 (Leval, J., concurring). But that is fanciful.[1] Examples of corporations in the atrocity business are few in history.[2] Maybe one day, pirate corporations will proliferate; if so, however, an international consensus may come to consider the principle of corporate liability.

The holding of this case matters nevertheless because, without it, plaintiffs would be able to plead around <u>Talisman</u> in a way that (notwithstanding <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S. Ct. 1937 (2009)) would delay dismissal of ATS suits against corporations; and the invasive discovery that

---

[1] I concede that the eponymous hero of <u>Captain Blood</u>, Warner Bros. (1935), played by Errol Flynn, did enter into profit-sharing with another pirate.

[2] I.G. Farbenindustrie Aktiengesellschaft would be one example from the 20th century (though the Nuremberg Tribunal did not indict). Earlier in the century, the human rights abuses in the rubber plantations of the Peruvian Amazon Company were exposed by Roger Casement's Putumayo Report. That would make, to my knowledge, two instances in the previous century, neither of which was the subject of ATS litigation; so I consider that the doctrinal principle is not of appreciable importance. (The Abir Congo Company, which ran the Belgian Congo for Leopold II, might be a 19th Century example, except that it was a kind of royal Subchapter S.)

7

ensues could coerce settlements that have no relation to the prospect of success on the ultimate merits. American discovery in such cases uncovers corporate strategy and planning, diverts resources and executive time, provokes bad public relations or boycotts, threatens exposure of dubious trade practices, and risks trade secrets. I cannot think that other nations rely with confidence on the tender mercies of American courts and the American tort bar. These coercive pressures, combined with pressure to remove contingent reserves from the corporate balance sheet, can easily coerce the payment of tens of millions of dollars in settlement, even where a plaintiff's likelihood of success on the merits is zero. Courts should take care that they do not become instruments of abuse and extortion. If there is a threshold ground for dismissal--and <u>Kiobel</u> is it--it should be considered and used.

   In short, this case has no great practical effect except for the considerable benefit of avoiding abuse of the courts to extort settlements. Judge Leval, *passim*, reads my words as giving absolution to moral monsters. For the record: even moral monsters are humans, and *I* would happily see them hanged.

                              *    *    *

The majority opinion demonstrates why ATS suits against corporations are foreclosed.  It is a matter of great importance to say so, in order to promote international comity, to administer efficient handling of cases, and to avoid the use of our courts to extort settlements.

I therefore vote to deny panel rehearing.

LEVAL, *Circuit Judge*, dissenting from the denial of rehearing:

Addressing an issue not raised by the defendants in the district court, the majority opinion rules that the law of nations does not apply to the conduct of corporations (and other juridical entities) and that we therefore lack jurisdiction to hear this case brought against a corporation under the ATS.[1] Chief Judge Jacobs has filed a separate opinion concurring in the denial of rehearing, which sheds new light on the motives that underlie the majority's ruling. His observations call for comment.

Chief Judge Jacobs reveals an intense, multi-faceted policy agenda that underlies the majority's undertaking to exempt corporations from the law of nations. He observes that many of the suits under the ATS are brought against foreign transnational corporations, "often engines of their national economies." He finds it offensive for "American courts and lawyers . . . to inquire into their operations in third countries, to regulate them – and to beggar them by rendering their assets into compensatory damages, punitive damages, and (American) legal fees." He concludes such suits undermine comity among nations because they "provoke international rivalry, divisive interests, competition, and grievance – the very opposite of

---

[1] The majority resuscitate this forfeited issue by concluding that it raises a question of the court's subject matter jurisdiction. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 117-18, 124-25, 145, 149 (2d Cir. 2010). It is highly questionable, especially in view of the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2876-77 (2010), whether the applicability of the law of nations to corporate conduct raises a question of subject matter jurisdiction. The ATS gives the federal courts jurisdiction to hear suits alleging torts in violation of the law of nations. The plaintiffs have pleaded a tort in violation of the law of nations. The question whether a corporation is liable for the alleged conduct appears, under *Morrison*, to be a merits question, *id.*, properly adjudicated under Fed. R. Civ. P. 12(b)(6), rather than a question of the court's power to hear the case.

1

universal consensus that sustains customary international law." He characterizes the hearing of ATS suits in U.S. courts as "judicial imperialism," which "harm[s] other civilized nations." He deplores that "American discovery in such cases uncovers corporate strategy and planning, diverts resources and executive time . . . [and] threatens exposure of dubious trade practices." These outrages call for the exemption of juridical entities from the rules of the law of nations.[2]

I do not contend by any means that *all* of Judge Jacobs's policy concerns are frivolous. If it were the proper role of a panel of the U.S. courts to make and implement the foreign policy of the United States, some of his concerns would call for serious attention and evaluation, and would require counterbalancing against concerns for the rights of victims of human rights abuses and the observance of a statute duly passed in the first session of the United States Congress. The more reasonable of his concerns, however, do not justify the majority's arbitrary and categorical solution – for several reasons. Exempting all juridical entities from observance of the humanitarian rules of the law of nations goes far beyond a reasonable solution. Much can be done about the problems created by ATS suits without giving juridical entities carte blanche to violate fundamental human rights. Furthermore, in seizing the initiative to make foreign and

_____

[2] Judge Cabranes's opinion concurring in the denial of rehearing reassures us that none of the pro-corporate and anti-ATS concerns voiced in the Chief Judge's opinion in any way influenced the majority's discovery that the law of nations exempts corporations. It was dictated solely by fidelity to law and the absence of a universal norm of corporate liability. While this reassurance is comforting, it still fails to explain why, if the absence of a universal norm of customary international law to award civil compensatory damages against corporations compels the conclusion that corporations have no civil liability under international law, the identical absence of any practice, outside the United States, to award civil compensatory damages against natural persons does not compel the same conclusion. The majority's reasoning is internally self-contradictory and incompatible with the Supreme Court's decision in *Sosa*. *See Kiobel*, 621 F.3d at 174-77 (Leval, J.).

domestic policy by curtailing the law of nations, the majority has arrogated to itself a power that might appropriately be exercised by the Congress or by the Executive Branch, but does not properly belong to the courts. Finally, most of Judge Jacob's grievances are against the exercise of ATS jurisdiction generally and against the burdens our legal system places on defendants generally and have no bearing on whether tort liability falls on corporations as well as individuals.

1. Neither our judicial system, nor any other, is perfect. And in some respects, the virtues of a legal system are also its vices. To the extent a judicial system offers victims of abuse a reasonable opportunity for redress of wrongs inflicted on them, to the same extent it subjects defendants to the expense and intrusion of discovery, to a risk of unmerited liability, and therefore to a pressure to settle claims even where they have not violated any law. In the context of ATS suits, Judge Jacobs finds that the burdens, risks, and pressures that they place on defendants justify the categorical exemption of all corporations, trusts, partnerships, and other juridical entities from the rules of the laws of nations. The problems Judge Jacobs identifies, however, arise in suits under U.S. law, as well as in those under international law. To avoid the problem by arbitrarily exonerating juridical entities is no more appropriate for suits invoking international law than for those invoking domestic law and no more justified for corporate defendants than for defendants who are natural persons.

2. The majority's remedy is substantial overkill. To the extent Judge Jacobs airs reasonable grievances, these can be ameliorated by less drastic measures, which do not leave juridical entities free to conduct businesses based on the abuse of human rights without exposure

3

to civil liability. As for the potentially excessive expense and intrusion of discovery, our recent holding in *Talisman* (which limits liability for aiding and abetting violations of the law of nations to circumstances where the defendant affirmatively sought to advance the violation) provides significant protection; courts can dismiss at the outset cases in which the plaintiffs' pleadings fail to allege such purposive violation. *See* 582 F.3d at 259. Judge Jacobs says plaintiffs can irresponsibly plead around this obstacle. If they do, courts can initially limit discovery to that issue, and be ready to grant summary judgment if the plaintiffs are unable, after reasonable targeted discovery, to produce evidence of purpose that would satisfy the standard. Courts can also guard against irresponsible overpleading by sanctions under Rule 11.

3. Judge Jacobs is not wrong in observing that defendants in jury trials in U.S. courts can be under pressure to settle – even where they have done nothing wrong – because of the great latitude we give juries, especially over damages for intangible, nonquantifiable injuries. Our court has ruled, however, that juries are not at liberty to award any sum without limit, for even the most serious of nonquantifiable injuries, and that courts should exercise care to supervise unreasonably inflated jury verdicts. *See, e.g.*, *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1009-12 (2d Cir. 1995), *judgment vacated on other grounds by*, 518 U.S. 1031 (1996). By exercising the authority to control inflated verdicts, courts can and should protect against jury excesses. In any event, the problem of the risk of excessive jury verdicts putting unreasonable pressure on defendants to settle nonmeritorious claims applies no more to ATS suits against corporations than to ATS suits against natural persons, as well as to nearly every branch of domestic tort litigation.

4

4. According to Judge Jacobs, exempting corporations from liability under the law of nations has no serious adverse consequences because: (1) Corporations do not behave badly except in the rarest of instances, amounting to one or two per century;[3] (2) natural persons who do behave badly do not adopt the corporate form; and (3) under our holding in *Talisman*, liability may be imposed only in cases of the most serious abuses.

I have no idea what is the basis of the Chief Judge's confidence that corporations do not behave badly, or that business enterprises based on the abuse of human rights do not utilize the business advantages provided by corporate and other juridical forms.[4] I do not share Judge Jacob's confidence that, if corporations other than I.G. Farben, the Peruvian Amazon Company, and the Abir Congo had violated human rights during the last two centuries, they would have seen to it that the world be informed of their abuses. While I do not purport to have any better information on the subject than the Chief Judge, it is my impression that those who conduct heinous and illegal businesses, such as slave trading, do not publicize that fact. Indeed, one of the many reasons why they might wish to conduct such businesses behind the veil of a juridical entity is to secure greater anonymity.

Nor is secrecy the only reason why pirates, slave traders, and other commercial abusers

---

[3] He cites I.G. Farben, the Peruvian Amazon Company, and the Abir Congo Company. Because he considers these the only instances of corporate violations of law of nations in two centuries, Judge Jacobs believes my concern for the non-suiting of victims is "fanciful."

[4] Judge Jacobs tells us that he abhors moral monsters and would happily see them hanged. Whether moral monsters should be hanged is not what our dispute is about. The question is whether, when a child enslaved for prostitution eventually obtains her freedom and sues, she can recover the profits the business earned from the sale of her body. The majority's answer is an unhesitating No.

of human rights might prefer to use juridical business forms. There are substantial additional reasons – the same reasons that lead lawful businesses to use such forms. The corporate, trust, and partnership forms are designed to provide numerous advantages and conveniences to investment and commerce. Slave trading, piracy, and mercenary warfare can be lucrative but expensive businesses. They require capital and therefore need to solicit investments. Investors in turn demand the protections afforded by such juridical forms of organization, including limitation of liability. We are told that pirates now operating in Somalia organize in the form of limited, profit-sharing partnerships so as to secure investments in their operations, *see Kiobel*, 621 F.3d 111, 156 n.10 (2d Cir. 2010), and may therefore already qualify for the benefits of the exemption provided by the majority. Furthermore, we learn in the press that more and more of the functions previously performed throughout the world by official military forces are now being outsourced to private contractors. A recent New York Times article reported that contractors comprise nearly 60% of the United States forces in Afghanistan, performing armed protective services among other functions. James Glanz, *Contractors Outnumber U.S. Troops in Afghanistan*, N.Y. Times, Sept. 1, 2009, http://www.nytimes.com/2009/09/02/world/asia/ 02contractors.html; *see also* Mark Mazzetti & Eric Schmitt, *Blackwater Founder Said to Back Mercenaries*, N.Y. Times, Jan. 20, 2011, http://www.nytimes.com/2011/01/21/world/africa/ 21intel.html. I can see no reason justifying the Chief Judge's confidence that private military forces operated for profit do not and will not contract their services to despots and others for the conduct of dirty business.

Judge Jacobs further argues that the majority's ruling can have no more than trivial

6

detrimental effect because, under our holding in *Talisman*, liability may be imposed for aiding and abetting only in the most serious cases – those in which the defendant acted with a *purpose* to violate the law of nations. In other words, the defendants who secure exoneration by the operation of the majority's rule are the ones who acted most heinously, such as slave traders, pirates, and mercenaries who contract to torture and carry out genocides. The remainder, whose assistance to the abuses of a government was merely incidental to a proper business purpose, are exonerated in any event without need to rely on the exemption of corporations. Because, in the Chief Judge's view, corporations do not behave badly, the cases "actually foreclosed by the majority opinion . . . approach[ ] the vanishing point."

To justify a rule that exempts certain defendants from liability on the ground that the rule protects only the very worst offenders is strange logic.

5. The Chief Judge's next point is that ATS cases represent "judicial imperialism" by United States judges, which affronts foreign nations. Where the defendant is a foreign person or where the conduct occurred in another nation, such suits are more appropriately judged in the courts of a foreign nation.[5] This may well be a reasonable concern – at least where the courts of that nation can be expected to conduct a fair proceeding. In such cases, there are indeed reasonable arguments why U.S. courts should abstain in favor of foreign tribunals, which would

---

[5] Assuming Judge Jacobs's is correct that such suits are more appropriately judged in the courts of the foreign nation, this is no way explains the majority's ruling that corporations are exempt from the rules of international law no matter where the suit is to be judged. Further, following Judge Jacobs's justification, the judgment of a U.S. court would be altogether appropriate when the defendant accused of violating international law is a U.S. corporation. Nevertheless, the majority's ruling immunizes U.S. corporations as well as foreign corporations.

7

substantially alleviate Judge Jacobs's concerns.

On the other hand, if the corporate defendant is indeed the "engine of [that nation's] economy," or if the particular nation whose courts would adjudicate sponsored the very atrocities that are the subject of the suit, it may in some circumstances be doubted whether the judges of that nation (many of whom serve at the pleasure of the executive) will afford the plaintiffs a fair proceeding. Judge Jacobs finds it entirely acceptable to consign adjudication of abuses that took place with the sponsorship and approval of the government that remains in power to the courts of that government. Such suits will be fair because "by definition, no one would protect an enemy of all mankind." The reasoning is not altogether convincing. But in any event, it fails to explain why the majority's solution is to exonerate all corporations – even from the judgment of courts of nations with a greater stake in the litigation.

As for Judge Jacobs's reliance on his perception of the foreign policy of the United States, I think it inappropriate for United States courts to so justify far-reaching rulings that narrow the scope of the law of nations without any guidance from the departments of government that are charged with formulating the foreign policy of the United States. If the Department of State advised us that it is in the interest of the nation's foreign policy that corporations be exempted from liability in suits under the ATS, or that a particular suit be dismissed under *forum non conveniens* or in the interests of international comity, we courts should of course give great deference to such advice. And if Congress passed a statute exempting corporations from liability under ATS, that would establish binding law.

But there is no such statute, and my colleagues did not seek guidance from the

8

Department of State, as courts conventionally do when concerned that a judgment might interfere with the executive branch's conduct of foreign policy. Whether the policy put into effect by this ruling serves the foreign policy of the United States is pure conjecture. The law of nations, in its objective to protect basic human rights, and the Alien Tort Statute, in its objective to enforce the law of nations, have been substantially weakened – in the service of the foreign policy of two judges.

Furthermore, to the extent that foreign policy concerns might counsel against adjudication in the U.S. courts of compliance by foreign actors with the law of nations, those concerns apply equally, or more so, where the defendants are natural persons – such as officials of foreign governments accused of humanitarian abuses. *See, e.g.*, *Filartiga v. Peña-Irala*, 630 F.2d 876, 878 (2d Cir. 1980). The majority's distinction between juridical persons and natural persons has no logical justification. Neither logic nor precedent justifies the proposition that those who earned profits by abusing human rights may be liable to victims if they are natural persons, but not if they are corporations.

6. Finally, Judge Jacobs purports to demolish my arguments by pointing to a treaty between the United States and the European Union which permits a signatory state to refuse to extradite a defendant who faces the death penalty in the requesting state. Judge Jacobs's belief that this rebuts my arguments depends on a misunderstanding of my arguments (or perhaps on simple non-sequitur).

As I explained in my opinion, quoting Professor Oscar Schachter, international law does not ordinarily dictate "the opportunities for private persons to seek redress in domestic courts for

breaches of international law by States.  There is no general requirement in international law that States provide such remedies.  *By and large, international law leaves it to them to meet their obligations in such ways as the State determines*."  *Kiobel*, 621 F.3d at 172 (Leval, J.) (emphasis added) (quoting Oscar Schachter, *International Law in Theory and Practice* 240 (1991)).  On that basis, Judge Jacobs concludes that my views (and Professor Schachter's) "rest[] on the idea that no account need be taken of how customary international law is enforced in our courts." This position, he asserts, is contradicted by the fact that a nation which objects to the death sentence may refuse to extradite a pirate if it objects to the requesting nation's criminal punishment.

Judge Jacobs reads into my words (and those of Professor Schachter) a message that isn't there.  To say that international law generally does not specify the remedies for violations of its norms, leaving the question of remedy to the enforcing nation, does not imply that each nation has license to enforce the norms of international law in any way it wishes.  If a nation chose, for example, to punish a violation of international law by inflicting another violation of international law – such as by torture – the punishment would of course be forbidden by the norms of international law.  Furthermore, there are indeed, as Judge Jacobs points out, a variety of reasons that can justify a nation's refusal to comply with an extradition request.

None of this contradicts Professor Schachter's observation that the international law of human rights is not a complete, self-sufficient system of rules.  The law of nations specifies a few norms of conduct, asserting a prohibition of a narrow range of heinous acts that command virtually world-wide disapproval, and in most instances leaves to individual nations how to

10

enforce those prohibitions. On the question whether nations should impose *civil*, *compensatory* liability for violation of those norms, it provides little guidance. And as for the majority's proposition that, while individuals may be held civilly liable to their victims, corporations are free to earn profits from the violation of human rights without liability of any sort, nothing in the precedents or scholarship of the law of nations lends it any support whatsoever. Chief Judge Jacobs justifies the rule on the basis of his desire to protect large transnational corporations from the expenses of discovery and damage awards and from the "judicial imperialism" of United States judges discharging their responsibilities under an act of Congress. Regardless whether his concerns have validity, the proposition that juridical entities are exempt from the rules of international law became a rule of international law only by virtue of the majority's decision to make it so. Neither the law of nations nor the Alien Tort Statute furnishes any basis for leaving corporate and other juridical entities free to violate fundamental human rights without liability to victims.

JOSÉ A. CABRANES, *Circuit Judge*, concurring in the denial of panel rehearing:

The questions of policy raised by my colleagues in response to the motion for panel rehearing are plainly important. The ATS covers, by definition, some of the most disgusting conduct of which man is capable. It is unsurprising that concern for the consequences of its reach engenders passion in all corners. But fidelity to the law, not a "policy agenda," dictated the majority opinion. *Contra* Judge Leval's Opinion Dissenting from Denial of Panel Rehearing 1. The text and history of the Alien Tort Statute, under our precedent—and that of the Supreme Court—requires that "violations of the law of nations," 28 U.S.C. § 1350, be defined by reference to international norms that are "specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004). That is, the scope of our subject matter jurisdiction under the ATS—who is liable for what— is determined by customary international law. Because corporate liability is not a discernible, much less universal, norm of customary international law, it cannot form the basis of a suit under the ATS. That is the long and short of the matter. Should Congress, in the exercise of its legislative discretion, wish to alter the scope of jurisdiction under the ATS, the courts will be bound to follow its direction. But the grave policy considerations which would surely underlie *that* decision, should not—and did not—drive our conclusion here.[1]

---

[1] Judge Leval seeks to continue to debate the logic and coherence of the majority opinion. *See* Judge Leval's Opinion Dissenting from Denial of Panel Rehearing 2 n.*. I rest with confidence that those who read the majority opinion will have no trouble understanding why customary international law recognizes individual, but not corporate, criminal liability—and why the ATS, which provides a civil remedy for violations of international law, therefore does not reach corporations.